JS 44
(Rev 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court of the purpose of initiating the civil docket sheet (SEE INSTRUCTION ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

**Barbara I. Smith, Derivatively on Behalf of Nominal Defendant Carreker Corporation**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF – LACHUTE, QUEBEC, CANADA

(EXCEPT IN U.S PLAINTIFF CASES)

## DEFENDANTS

**John D. Carreker, Jr., James D. Carreker, Richard R. Lee, Jr., James L. Fischer, Donald L. House, David K. Sias, Terry L. Gage and Carreker Corporation**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT - DALLAS COUNTY, TX

(IN U.S. PLAINTIFF CASES ONLY)

NOTE.    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

WILLIAM B FEDERMAN
FEDERMAN & SHERWOOD
120 N. ROBINSON, SUITE 2720
OKLAHOMA CITY, OK 73102
(405) 235-1560/Fax (405) 239-2112
AND
2926 MAPLE AVENUE, SUITE 200
DALLAS, TX 74201
(214) 696-1100/Fax (214) 740-0112

RECEIVED
MAY 29 20
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

ATTORNEYS (IF KNOWN)

3-03CV1211-D

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U S Government Plaintiff
- ☐ 2 U S Government Defendant
- ☐ 3 Federal Question (U S Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Med | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Liability | ☐ 630 Liquor Laws |  | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R R & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine |  | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending |  |  | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability |  | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
|  |  |  | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl Ret Inc Security Act |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty |  | **FEDERAL TAX SUITS** | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other |  | ☐ 870 Taxes (U S Plaintiff or Defendant) |  |
| ☐ 290 All Other Real Property |  | ☐ 550 Civil Rights |  | ☐ 871 IRS - Third Party 26 USC 7609 |  |
|  |  | ☐ 555 Prison Condition |  |  |  |

## V. ORIGIN    PLACE AN "X" IN ONE BOX ONLY

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U S CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

SECURITIES CLASS ACTION ALLEGING VIOLATIONS OF SECTIONS 10(B) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10B-5

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE - Barbara M. G. Lynn    DOCKET NUMBER - 3-03-CV-0250-M

DATE  5-28-03

SIGNATURE OF ATTORNEY OF RECORD

William b. Federman

FOR OFFICE USE ONLY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAY 2 9 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| BARBARA I. SMITH, DERIVATIVELY ON BEHALF OF NOMINAL DEFENDANT CARREKER CORPORATION, | No. |
| Plaintiff, | **SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JOHN D. CARREKER JR., JAMES D. CARREKER, RICHARD R. LEE, JR., JAMES L. FISCHER, DONALD L. HOUSE, DAVID K. SIAS, TERRY L. GAGE, | 3- `` ``V 1 2 1 1 - D |
| Defendants, | |
| and | |
| CARREKER CORPORATION, | |
| Nominal Defendant. | |

Plaintiff, Barbara I. Smith, by her undersigned attorneys, alleges, upon information and belief (said information and belief being based, in part, upon the investigation conducted by and through her counsel), except with respect to paragraph 9, which is alleged upon personal knowledge, as follows:

## NATURE OF THE ACTION

1. This is a shareholders' derivative action brought pursuant to Rule 23.1, Fed.R.Civ.P., for the benefit of Nominal Defendant Carreker Corporation ("Carreker" or the "Company") against certain of its current officers and directors, ie, John D. Carreker, Jr. ("J. D. Carreker"), James D. Carreker ("James Carreker"), Richard R. Lee, Jr. ("Lee"), James L. Fischer ("Fischer"), Donald L. House ("House"), David K. Sias ("Sias") and Terry L. Gage ("Gage") (collectively "Defendants"), seeking to remedy their individual breaches of fiduciary duty,

including their knowing violations of Generally Accepted Accounting Principles ("GAAP"), knowing violations of federal and state securities laws, acts of bad faith and other breaches of fiduciary duty.

2.      Plaintiff seeks redress for injuries to the Company and its shareholders caused by Defendants' misfeasance and/or malfeasance during the period from May 20, 1998 through December 10, 2002 (the "Relevant Period").

3.      During the Relevant Period, the Company, through the Defendants, filed a Registration Statement and Prospectus for the Company's initial public offering, issued press releases, filed quarterly and annual reports with the Securities & Exchange Commission ("SEC") and made other public statements that highlighted the Company's seeming ability to consistently grow its revenues and earnings, causing its stock price to rise correspondingly. These statements were materially false and misleading because they failed to disclose that the Company had engaged in improper accounting practices, namely, improper revenue recognition, thereby artificially inflating the Company's reported financial results.

4.      On December 10, 2002, Carreker issued a press release announcing that it was reviewing its previously published and filed financial statements because the Company might have improperly recognized revenues and that its previous financial reports should not be relied upon. According to the press release, the investigation focused on the improper timing of revenue recognition, which would likely be fixed through a restatement of its financial statements shifting the revenues to the quarter in which they should properly have been recognized under GAAP. In response to this disclosure, the price of Carreker common stock plummeted, falling from a December 9, 2002 close of $5.08 per share to a closing price of $3.98 per share on December 10, a one day decline of 22.6%.

5.     Shortly thereafter, the SEC opened an investigation into the Company's accounting practices, which is ongoing.  On January 28, 2003, the Company announced that it would restate its previous financial statements beginning with its fiscal year 1998.

6.     As a result of Defendants' fraudulent scheme, Carreker's Relevant Period financial statements and reports were materially false and misleading when made, thereby causing its securities to trade at artificially inflated prices throughout the Relevant Period, thereby damaging purchasers of Carreker's stock during the Relevant Period.  This further resulted in numerous securities fraud class action lawsuits being filed against the Company.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2). All Defendants are residents and citizens of the United States and Plaintiff is a resident and citizen of a foreign State, Canada.   The amount in controversy between plaintiff and the defendants exceeds $75,000.00, exclusive of interest and costs.

8.     Venue is proper in this district.  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this district, including the Defendants' decision to engage in the activities which gave rise to the acts underlying the breaches of fiduciary duty, the preparation and dissemination to the investing public of false and misleading information, usurpation of corporate assets and corporate waste.   Carreker maintains its executive offices at 4055 Valley View Lane, Dallas Texas 75244.  Many of the Defendants are also believed to reside within this district.

## PARTIES AND DEMAND EXCUSED ALLEGATIONS

9.     Plaintiff is a resident and citizen of Canada and was during the Relevant Period and continuously through the present a shareholder of Nominal Defendant Carreker.

I:\Carreker\derivative\Complaint.DOC



10.     Nominal Defendant Carreker is a Delaware corporation with its principal executive offices located at 4055 Valley View Lane, Dallas, Texas 75244. Carreker provides integrated software and consulting solutions to banks. Carreker was formerly known as Carreker-Antinori, Inc. Carreker may be served with process by serving its registered agent for service, CT Corporation, 350 N. St. Paul Street, Dallas, Texas, 75201.

11.     Defendant J. D. Carreker, an inside director, has served as Chairman of the Board of Directors and Chief Executive Officer of the Company since the Company's formation in 1978. As of April 30, 2003 J. D. Carreker owned 11.57% of the Company's outstanding shares and is the Company's largest shareholder. J. D. Carreker signed all of the Company's materially false and misleading financial statements filed with the SEC during the Relevant Period, including the Prospectus (as defined below). J. D. Carreker may be served with process by serving him at Carreker's executive offices at 4055 Valleyview Lane, Dallas, Texas 75244.

12.     James Carreker has served as a director of the Company since 1984. James Carreker headed the Audit Committee of the Company's Board of Directors beginning in 1997 and served at least until April 2000. James Carreker continues to carry much influence over the Audit Committee's oversight of the Company's management and methods of recognizing revenue. James Carreker served as CEO of Trammell Crow Company from August 1994 to December 1995 and thereafter served, and continues to serve, on its board of directors. James Carreker and J. D. Carreker are brothers.

13.     Defendant Sias has served as a Director of the Company since October of 1993. Sias served on the Audit Committee of the Company's Board of Directors from at least March 1998 through April 2000 and according to the Company's website currently serves on same. Sias served as a paid consultant to the Company from November 1993 until July 2001. Sias

4

provided special consulting services to the Company in connection with its merger with Antinori Software in 1997. In addition to a monthly consulting fee in the amount of $4,167 the Company paid Sias a special fee of $200,000 to compensate him for his time and efforts spent on behalf of the Company in connection with the merger. The Company paid consulting fees to Sias in the aggregate amounts of $71,682, $64,310 and $36,178 in fiscal years 1997, 1996 and 1995 respectively.[1]

14.    Lee has served as a Director of the Company since 1984. Lee was appointed to the Audit Committee of the Company's Board of Directors on March 16, 2001, and continues to serve to the present. Lee has also served as President of Lee Financial Corporation, a financial advisory firm, since 1975. The Company paid Lee Financial Corporation $33,887 in 1997 for investment management services. Persons identified as former or current employees of Carreker have advised Plaintiff's counsel that Lee has acted as a paid consultant and advisor to J. D. Carreker and his family, has been actively involved in the management of the Carreker family's estate and has served as trustee of various trusts holding substantial Carreker shares.

15.    Fischer has served as a Director of the Company since 1984. He has also served on the Audit Committee since at least May 2001. Persons believed to be current or former employees of Carreker have informed Plaintiff's counsel that in 1999 Fischer and former Carreker Director Ron Antinori were advised by Carreker employees of several particular instances of fraudulent revenue recognition perpetrated on behalf of the Company by J. D. Carreker, but refused to investigate or take actions to prevent future violations.

---

[1] The amounts paid by the Company to Sias for Consulting Services performed by Sias during the years 1998-2001 is currently not known by Plaintiffs.

5

16. House has served as a Director of the Company since March 30, 1998. House has also served as a member of the Audit Committee of the Company's Board of Directors since at least May 2001.

17. Defendant Gage has served as Executive Vice President, Treasurer and Chief Financial Officer of the Company since 1995 and was elected Assistant Secretary of the Company in April 1997. Defendant Gage signed all of the Company's materially false and misleading financial statements filed with the SEC during the relevant period, including the Prospectus (as defined below.) Gage may be served with process by serving him at Carreker's executive offices.

18. Carreker's Board of Directors is currently composed of nine (9) directors – J. D. Carreker, James Carreker, House, Fischer, Lee, Sias, Ronald G. Steinhart ("Steinhart"), James R. Erwin ("Erwin"), and Michael D. Hansen ("Hansen"). Each of these Directors, except Steinhart, Erwin and Hansen, have been named as defendants herein.

19. Steinhart has served as a Director of the Company since April 2001, and has been a member of the Audit Committee of the Company's Board of Directors since at least May 2002.

20. Erwin has served on the Board of Directors since May 29, 2001. Erwin has also served as a Director of Trammell Crow Company since 1997. Defendant Director James Carreker also serves on the Board of Directors of Trammell Crow Company.

21. Hansen, an inside director, has served as a Director of the Company since 2001. Hansen has also served as President and Chief Operating Officer of the Company since 2001. From October 2000 to December 2001, Hansen served as Executive Vice President and Managing Director of the Company. For fiscal year 2002, Hansen received from the Company salary in the amount of $330,083, options to purchase 49,500 shares of Carreker stock and

6

$23,721 in other compensation. Hansen is beholden to, and dependent upon, the Defendant Directors, which constitute a majority of the Board, and particularly Defendant Chairman of the Board J. D. Carreker, for his continued employment with Carreker and continued receipt of the handsome compensation package which accompanies same.

22.     The Board is controlled and directed by Defendant J. D. Carreker the founder of the Company, its current Chairman and CEO and the Company's largest shareholder. Because of the other Directors' longtime relationships with J. D. Carreker, dependence upon J. D. Carreker for their continued livelihood and/or involvement or acquiescence in the wrongdoing alleged herein, among other things, a majority of the Board lacks the necessary independence and disinterestedness to make an objective determination whether to institute a lawsuit against the Defendant officers and directors named herein.

23.     As a result of the facts alleged herein, Plaintiff has not made any demand on the Carreker Board of Directors to institute this action against the Defendant officers and directors of Carreker. Such demand would be futile and a useless act because a majority of the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

24.     Because of the Defendants' positions with the Company, they had access to the adverse, undisclosed information about its business, operations, products, operational trends, financial statements, markets, as well as present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings

and committees thereof and via reports and other information provided to them in connection therewith.

    25.    The Defendants participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Carreker, each of the Defendants had access to the adverse undisclosed information about Carreker's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Carreker and its business issued or adopted by the Company materially false and misleading.

    26.    The Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. Each Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Defendants is responsible for the accuracy of the public reports and releases detailed herein and the representations contained therein.

**DUTIES AND RESPONSIBILITIES OF INDIVIDUAL DEFENDANTS**

    27.    Each Defendant, because of his position as a director and/or officer of Carreker, owed a fiduciary duty to the Company and its shareholders in connection with its operations, management and direction.

8

I:\Carreker\derivative\Complaint.DOC

28.     To discharge these duties, the Defendants were required, among other things to:

(a)     Manage, conduct, supervise and direct the business affairs of Carreker in accordance with applicable state and federal law and rules and regulations and the charter and bylaws of Carreker;

(b)     Neither violate nor permit any officer, director, agent or employee of Carreker to violate applicable state law, federal law, rules, regulations or Company charter and bylaws;

(c)     Establish and maintain systematic and accurate books and records of the business and affairs of Carreker and procedures for the reporting of Carreker's business and affairs to the Board of Directors, and periodically investigate, or cause independent investigation to be made, said books and records;

(d)     Maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Carreker's financial statements and information would be accurate;

(e)     Exercise supervision over the public statements made and/or issued to the securities markets relating to Carreker;

(f)     Remain informed as to the status of Carreker's business, conditions, practices and operations, and upon receipt of notice or information of imprudent or unsound practices or operations, to make a reasonable inquiry in connection therewith, and to take steps to correct such practices or operations and make such disclosures as are necessary to comply with state and federal securities laws; and

(g)     Supervise the preparation and filing of any audits, reports or other information required by law by Carreker, and examine and evaluate any reports of examinations,

I:\Carreker\derivative\Complaint.DOC



audits or other financial information concerning the financial affairs of Carreker, and make full and accurate disclosure of all material facts concerning, among others, each of the subjects and duties set forth above.

29.     The members of Carreker's Board of Directors, including J. D. Carreker, James Carreker, Sias, Lee, House and Fischer had the responsibility to insure that the financial statements of the Company were based upon accurate financial information about the Company, and that those financial statements were properly prepared.    Furthermore, the Director Defendants had the responsibility to, among other things:

(a)     consult with the Company's independent auditors with respect to their audit plans;

(b)     review the independent auditors' audit report and the accompanying management letter;

(c)     consult with the independent auditors with regard to financial reporting; and

(d)     consult with the independent auditors with regard to the adequacy of internal controls.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

30.     Carreker is a software and consulting company serving the banking industry.  Its business falls into the following three groups:

(a)     Revenue Enhancement: seeks to maximize revenue for banks through market segmentation and innovative customer pricing structures;

(b)     Global Technology: seeks to minimize payment processing expenses, optimizing cash inventory and assisting in the transition from paper to electronic-based payment systems; and

(c)     Enterprise Solutions: integrates systems, combines operations and seeks to improve workflows and internal operational processes.

31.     On May 20, 1998, the Company made an initial public offering (the "Offering") by selling (together with certain selling shareholders), 5.1 million shares of common stock for $11 per share.  The Offering was commenced by the filing of a Registration Statement (the "Registration Statement"), which incorporated by reference a prospectus (the "Prospectus") with the SEC on Form S-1/A, which was signed by defendants J.D. Carreker, James Carreker, Fischer, Lee, Sias, House and Gage, among others (the Registration Statement and Prospectus are collectively referred to herein as the "Prospectus").

32.     According to the financial statements filed by the Company with the SEC during the Relevant Period, the Company was consistently growing its revenues and earnings by leaps and bounds, and delivering numerous consecutive quarters of record, double-digit growth, which the Company attributed to the strong demand for its products and Carreker's business model. In addition, during the Relevant Period, the Company expressly assured investors of its "dedication to transparent reporting practices" and highlighted the supposed "quality and integrity of [Carreker's] accounting and corporate governance practices."  These statements were materially false and misleading because they failed to disclose that the Company had been improperly recognizing revenues throughout the Relevant Period, thereby artificially inflating its revenues, income and earnings per share.

33.     These practices first came to light on December 10, 2002 when the Company issued a press release announcing that it was investigating whether revenues were improperly recognized by being booked at once instead of ratably over a period of time, as required by GAAP. The Company's (belated) disclosure that it had been improperly recognizing revenues severely and negatively impacted its stock price, causing it to fall by 22.6% in one day on extremely heavy trading volume, from a December 9 close of $5.08 per share to close at $3.93 per share on December 10.

34.     Subsequently, the SEC initiated an investigation, which is ongoing, into the Company's accounting practices.

35.     On January 28, 2003, the Company announced that it would restate its financial reports filed since 1998.

36.     Thereafter, Carreker began to be inundated with securities fraud class action lawsuits filed against the Company and certain of its officers and directors.

37.     As a direct result of Defendants' active and/or passive misconduct, Carreker has been irreparably damaged. Following the disclosure of Defendants' misdeeds, hundreds of millions of dollars in Carreker's market capitalization was erased and wiped out. Defendants' gross mismanagement and abuse of control has not only affected parts of the Company's business, operations, reputation and capitalization but has also caused Carreker to incur hundreds of millions of dollars in exposure to defraud of purchasers of Carreker's publicly traded securities and millions of additional dollars in investigation and legal fees.

**Materially False and Misleading**
**Statements Made During the Relevant Period**

38.     The Relevant Period begins on May 20, 1998. On that date the Prospectus became effective and the Company became a publicly traded company by offering and selling 3,650,000

shares. Additionally, 1,450,000 shares of Carreker stock were offered and sold by certain selling

shareholders. In total, 5.1 million shares of Carreker stock were sold, at $11 per share, in the

Offering.

39.   Among other things, the Company's revenue recognition policy provided:

**REVENUE RECOGNITION**

Revenue for consulting services performed under fixed-price contracts which are generally in duration in excess of six months is recognized on a percentage-of-completion method. Revenue from these contracts is recognized on a percentage-of-completion method. Revenue from these contracts is recognized in the proportion that costs incurred bear to total estimated costs at completion. Anticipated losses on fixed-price contracts are recognized when estimable. Revenue generated from consulting services and under management services contracts is recognized as services are performed. Revenue generated from value-priced consulting services is recognized at the completion of all services and the actual fee to be paid has been agreed to by the customer even though billings for such services may be delayed by mutual agreement for periods generally not to exceed six months. Maintenance contract revenue is recognized ratably over the term of the related contract. Revenue from computer hardware sales is recognized upon shipment.

In connection with software license agreements entered into with certain banks and purchase agreements with vendors under which the Company acquired software technology used in products sold to its customers, the Company is required to pay royalties on future sales of the software. Approximately $123,000, $724,000 and $816,000 of royalty expense was recorded under these agreements in the years ended January 31, 1996, 1997 and 1998, respectively.

In October 1997, the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants issued Statement of Position No. 97-2, "Software Revenue Recognition" (SOP 97-2), which supersedes Statement of Position No. 91-1. SOP 97-2 will be effective for all transactions entered into by the Company subsequent to January 31, 1998. The Company is continuing to evaluate the impact that SOP 97-2 will have on license revenue transactions entered into subsequent to January 31, 1998. Based upon the Company's reading and interpretation of SOP 97-2, the Company believes that SOP 97-2 will not have a material impact on future operating results. However, detailed



implementation guidelines for this standard have not been issued. Once issued, such detailed implementation guidelines could result in changes in the Company's current revenue recognition practices, and such changes could be material to the Company's revenues and earnings.

40.     In a section of the Prospectus titled "Summary Consolidated Financial Data," the

Company reported its results of operations since 1994. As the reported data (in thousands except

per share data) shows, the Company's revenues and earnings appeared to be growing sharply and

consistently:

|  | YEAR ENDED JANUARY 31, | | | | |
|---|---|---|---|---|---|
|  | 1994 | 1995 | 1996 | 1997 | 1998 |
| STATEMENT OF OPERATIONS DATA: | | | | | |
| Total revenues | $9,606 | $13,084 | $18,549 | $29,072 | $40,501 |
| Income (loss) from operations | (1,284) | 593 | 2,723 | 2,884 | 5,009 |
| Net Income (loss) (2) | (922) | 697 | 1,862 | 1,376 | 3,055 |
| Basic earnings (loss) per share (3) | (.08) | .06 | .16 | .13 | .27 |
| Diluted earnings per share (3) | ---- | .06 | .15 | .12 | .23 |
| Shares used in computing basic earnings per share (3) | 11,547 | 11,548 | 11,543 | 10,914 | 11,477 |
| Shares used in computing diluted earnings per share (3) | ---- | 11,878 | 12,092 | 11,878 | 13,244 |

[footnotes omitted]

41.     The Prospectus further represented that the above-reported financial results, as

well as the other financial information contained therein, were prepared in accordance with

GAAP.  In this regard, the Prospectus contained the following letter from Ernst & Young LLP,

the Company's outside auditors:

We have audited the accompanying consolidated balance sheets of Carreker-Antinori, Inc. (the Company), as of January 31, 1997 and 1998, and the related consolidated statements of operations, stockholders, equity, and cash flows for each of the three years in the period ended January 31, 1998.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

14

*** 

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Carreker-Antinori, Inc., at January 31, 1997 and 1998, and the results of its operations and its cash flows for each of the three years in the period ended January 31, 1998, in conformity with generally accepted accounting principles.

42.     The Prospectus was materially false and misleading when it became effective because it failed to disclose the following adverse facts, among others:

(a)     the Company had been improperly recognizing a material portion of its revenue by booking revenues at once which properly should have been recognized over a period of time, thereby materially inflating its reported revenues and earnings;

(b)     the Company had breached its revenue recognition policy, as stated in the Prospectus and as set forth herein in ¶40; and

(c)     the financial statements contained in the Prospectus were not, contrary to the express representation contained in the Prospectus, prepared and presented in accordance with GAAP.

43.     On July 2, 1998, Carreker filed its financial report for its first fiscal quarter ended April 30, 1998 with the SEC on Form 10-Q, which was signed by defendants J.D. Carreker and Gage. In a section of the Form 10-Q titled "Basis of Presentation", the Company represented that the financial statements contained therein fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

1. BASIS OF PRESENTATION

The accompanying unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments (consisting only of normal, recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows of the Company. Certain information and footnote disclosures normally included in financial statements prepared in

15

accordance with generally accepted accounting principles have been condensed or omitted pursuant to rules and regulations promulgated by the Securities and Exchange Commission. These statements should be read in conjunction with the audited financial statements and notes thereto for the years ended January 31, 1996, 1997, and 1998 included in the Company's Prospectus, dated May 20, 1998 on file with the Commission. ...

In the Form 10-Q, the Company reported an impressive increase in revenues, to $10.2 million in the quarter, a 36% increase over the first quarter of 1997. Specifically, the Company reported the following results:

|  | Three Months Ended April 30, | |
|---|---|---|
|  | 1997 | 1998 |
| Revenues: | | |
| Consulting and management service fees | $4,139 | $5,014 |
| Software license fees | 1,261 | 3,146 |
| Software maintenance and implementation fees | 1,793 | 1,859 |
| Hardware sales | 321 | 238 |
| Total revenues | 7,514 | 10,257 |
| Net income | $146 | $360 |
| Basic earnings per share | $0.01 | $0.03 |
| Diluted earnings per share | $0.01 | $0.03 |

44.   On September 14, 1998, the Company filed its financial report for its second fiscal quarter ended July 31, 1998 with the SEC in Form 10-Q, which was signed by defendants J.D.Carreker and Gage. In a section of the Form 10-Q titled "Basis of Presentation", the Company represented that the financial statements contained therein fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

1. BASIS OF PRESENTATION

The accompanying unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments (consisting only of normal, recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows of the Company. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have

16

been condensed or omitted pursuant to rules and regulations promulgated by the Securities and Exchange Commission. These statements should be read in conjunction with the audited financial statements and notes thereto for the years ended January 31, 1996, 1997, and 1998 included in the Company's Prospectus, dated May 20, 1998 on file with the Commission. ...

According to the Form 10-Q, revenues and income for the second quarter of 1998 increased

dramatically over the second quarter of 1997. In this regard, the Form 10-Q reported the

following financial results:

| | Three Months Ended July 31, | | Six Months Ended July 31 | |
| --- | --- | --- | --- | --- |
| | 1997 | 1998 | 1997 | 1998 |
| Revenues: | | | | |
| Consulting and management service fees | $6,777 | $5,589 | $10,916 | $11,603 |
| Software license fees | 1,163 | 3,800 | 2,424 | 6,946 |
| Software maintenance | 899 | 1,076 | 1,732 | 2,024 |
| Software implementation fees | 1,135 | 2,031 | 2,095 | 2,942 |
| Hardware sales and other fees | 906 | 184 | 1,227 | 422 |
| Total revenues | 10,880 | 13,680 | 18,394 | 23,937 |
| Net income | 1,215 | $1,689 | $1,361 | $2,049 |
| Basic earnings per share | $0.11 | $0.11 | $0.12 | $0.15 |
| Diluted earnings per share | $0.09 | $0.10 | $0.11 | $0.14 |

45.     On December 15, 1998, the Company filed its financial report for its fiscal third

quarter ended October 31, 1998, with the SEC on Form 10-Q, which was signed by defendants

J.D. Carreker and Gage.   In a section of the Form 10-Q titled "Basis of Presentation", the

Company represented that the financial statements contained therein fairly presented the

Company's results of operations and financial condition, stating as follows in relevant part:

1. BASIS OF PRESENTATION

The accompanying unaudited condensed consolidated financial statements reflect in the opinion of the management, all adjustments (consisting only of normal, recurring adjustments)

17

necessary to present fairly the financial position, results of operations and cash flows of the Company. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to rules and regulations promulgated by the Securities and Exchange Commission. These statements should be read in conjunction with the audited financial statements and notes thereto for the years ended January 31, 1996, 1997, and 1998 included in the Company's Prospectus, dated May 20, 1998 on file with the Commission. ...

For the quarter, the Company again reported substantial increases in revenues and earnings compared with the year-ago period. Specifically, the Form 10-Q reported that the Company performed as follows in the third quarter of 1998:

|  | Three Months Ended October 31, | | Six Months Ended October 31 | |
| --- | --- | --- | --- | --- |
|  | 1997 | 1998 | 1997 | 1998 |
| Revenues: | | | | |
| Consulting and management service fees | $5,724 | $7,273 | $16,640 | $18,876 |
| Software license fees | 2,979 | 3,624 | 5,403 | 10,570 |
| Software maintenance fees | 920 | 1,016 | 2,652 | 3,040 |
| Software implementation fees | 936 | 1,938 | 3,031 | 4,880 |
| Hardware sales | 289 | 37 | 1,516 | 459 |
| Total revenues | 10,848 | 13,888 | 29,242 | 37,825 |
| Net income | $809 | $1,684 | $2,170 | $3,733 |
| Basic earnings per share | $0.07 | $0.10 | $0.19 | $0.26 |
| Diluted earnings per share | $0.06 | $0.10 | $0.17 | $0.24 |

46.     On March 22, 1999, Carreker issued a press release announcing "Record Fourth Quarter and Fiscal Year." According to the press release, the Company doubled fourth quarter 1998 net income, on a 29% rise in revenues. Revenues for the year also increased by 29.3% over the prior year, while income from operations reportedly increased by 50.7%. Commenting on the seemingly outstanding results, defendant J.D. Carreker highlighted the strong demand for the

I:\Carreker\derivative\Complaint DOC



Company's products and services, its cost controls and the consistency of its results, stating as follows in relevant part:

> "Banking industry consolidation continues as a major contributor to the strong demand we see for our business. Our high level relationships at the majority of Tier I banks in the U.S. allow us to cross-sell new offerings to existing customers, while expanding our presence in Tier III banks and other markets, such as in the UK and Canadian banks. Our profitability growth continues to outpace our revenue growth, reflecting our commitment to controlling costs and enhancing shareholder value. We are confident in our business model and in our ability to continue to deliver this type of consistent and profitable growth," said J.D. "Denny" Carreker, Chairman and CEO of [Carreker].

47.     On April 28, 1999, Carreker filed its 1998 annual report with the SEC in Form 10-K, which was signed by defendants J.D. Carreker, James Carreker, Fischer, Lee, Sias, House and Gage. The company represented that the financial statements contained therein were prepared in accordance with GAAP. In that regard, the Company included in the Form 10-K a letter from Ernst & Young, its outside auditor, which stated as follows in relevant part:

> REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS
>
> The Board of Directors and Stockholders
>
> Carreker-Antinori, Inc.
>
> We have audited the accompanying Carreker-Antinori, Inc. (the Company), consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended January 31, 1999. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on audits. ...
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Carreker-Antinori, Inc., at January 31, 1999 and 1998, and the results of its operations and its cash flows for each of the three years in the period ended January 31, 1999, in conformity with generally accepted accounting principles.

The Company reported substantial growth in the 1998 year, which represented the fifth year of strong consecutive growth in revenues and earnings.  Specifically, the Company reported the following results:

YEAR ENDED JANUARY 31,

| | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|
| | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | |
| STATE OF OPERATIONS DATA: Revenues: | | | | | |
| Consulting and management service fees | $26,328 | $21,314 | $14,407 | $9,635 | $6,090 |
| Software license fees | 16,327 | 11,223 | 6,957 | 4,316 | 3,247 |
| Software maintenance fees | 5,031 | 4,274 | 3,185 | 2,385 | 1,490 |
| Software implementation fees | 6,557 | 4,094 | 3,249 | 2,219 | 1,933 |
| Hardware sales and other fees | 774 | 1,876 | 2,737 | 1,341 | 1,050 |
| Total revenues | 55,017 | 42,781 | 30,535 | 19,896 | 13,810 |
| Net income | $5,172 | $3,005 | $1,360 | $1,859 | $849 |
| Basic earnings per share | $.32 | $.24 | $.11 | $.15 | $.07 |
| Diluted earnings per share | $ 30 | $.21 | $.10 | $.14 | $.07 |

48.     On June 14, 1999, the Company filed its quarterly report for its fiscal quarter ended April 30, 1999 with the SEC on Form 10-Q which was signed by defendants J.D. Carreker and Gage.  In a section of the Form 10-Q titled "Basis of Presentation", the Company represented that the financial statements contained therein fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

1. BASIS OF PRESENTATION

The accompanying unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments (consisting only of normal, recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows of the Company. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to rules and regulations promulgated by the Securities and Exchange Commission. These

20

statements should be read in conjunction with the audited financial statements and notes thereto for the years ended January 31, 1999, 1998, and 1997 included in the Company's Form 10-K for the fiscal year ended January 31, 1999 on file with the Commission. ...

The Company's blistering growth continued, according to the Form 10-Q, which reported Carreker's results as follows:

|  | Three Months Ended April 30, | |
|  | 1999 | 1998 |
|---|---|---|
| REVENUES: | | |
| Consulting and management service fees | $8,324 | $5,014 |
| Software license fees | 3,093 | 3,457 |
| Software maintenance fees | 1,502 | 1,143 |
| Software implementation fees | 1,443 | 989 |
| Hardware and other fees | 122 | 331 |
| Total Revenues | 14,484 | 10,934 |
| Net income | $963 | $383 |
| Basic earnings per share | $0.05 | $0.03 |
| Diluted earnings per share | $0.05 | $0.03 |

49.     On September 14, 1999, Carreker filed its quarterly report for its quarter ended July 31, 1999 with the SEC on Form 10-Q, which was signed by defendants J.D. Carreker and Gage. In a section of the Form 10-Q titled "Basis of Presentation," the Company represented that the financial statements contained therein fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

1. BASIS OF PRESENTATION

The accompanying unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments (consisting only of normal, recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows of the Company. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to rules and regulations promulgated by the Securities and Exchange Commission. These statements should be read in conjunction with the audited financial statements and notes thereto for the years ended January 31, 1999, 1998, and 1997 included in the Company's Form 10-K for the fiscal year ended January 31, 1999 on file with the Commission. ...

I:\Carreker\derivative\Complaint.DOC



The Company's reports of its strong growth continued, with the Form 10-Q reporting the following financial results:

|  | Three Months Ended July 31, | | Six Months Ended July 31 | |
| --- | --- | --- | --- | --- |
|  | 1999 | 1998 | 1999 | 1998 |
| Revenues: | | | | |
| Consulting and management service fees | $13,039 | $6,589 | $21,363 | $11,603 |
| Software license fees | 2,762 | 4,061 | 5,855 | 7,518 |
| Software maintenance | 1,764 | 1,285 | 3,266 | 2,428 |
| Software implementation fees | 1,232 | 2,136 | 2,675 | 3,125 |
| Hardware sales and other fees | 75 | 227 | 197 | 558 |
| Total revenues | 18,872 | 14,298 | 33,356 | 25,232 |
| Net income | $2,286 | $1,714 | $3,249 | $2,097 |
| Basic earnings per share | $0.12 | $0.10 | $0.18 | $0.14 |
| Diluted earnings per share | $0.12 | $0.10 | $0.17 | $0.13 |

50.     On December 15, 1999, the Company filed its quarterly report for its fiscal quarter ended October 31, 1999 with the SEC on Form 10-Q, which was signed by defendants J.D. Carreker, James Carreker, Fischer, Lee, Sias, House and Gage.  In a section of the Form 10-Q titled "Basis of Presentation", the Company represented that the financial statements contained therein fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

1. BASIS OF PRESENTATION

The accompanying unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments (consisting only of normal, recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows of the Company. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to rules and regulations promulgated by the Securities and Exchange Commission. These statements should be read in conjunction with the audited financial statements and notes thereto for the years ended January 31, 1999, 1998, and 1997 included in the Company's Form 10-K for the fiscal year ended January 31, 1999 on file with the Commission. ...

22

The Company again reported strong revenue and earnings growth, as follows:

| | Three Months Ended October 31, | | Six Months Ended October 31 | |
|---|---|---|---|---|
| | 1999 | 1998 | 1999 | 1998 |
| Revenues: | | | | |
| Consulting and management service fees | $15,072 | $7,273 | $36,436 | $18,876 |
| Software license fees | 2,692 | 3,818 | 8,546 | 11,336 |
| Software maintenance | 1,677 | 1,226 | 4,943 | 3,654 |
| Software implementation fees | 1,391 | 2,072 | 4,066 | 5,197 |
| Hardware sales and other fees | 34 | 160 | 230 | 718 |
| Total revenues | 20,866 | 14,549 | 54,221 | 39,781 |
| Net income | $2,033 | $1,670 | $5,282 | $3,767 |
| Basic earnings per share | $0.11 | $0.09 | $0.29 | 0.24 |
| Diluted earnings per share | $0 11 | $0.09 | $0.28 | 0.22 |

51.     On March 7, 2000, Carreker issued a press release announcing "Fourth Quarter EPS of $0.14 - a 100% Increase; Revenues up Over 41%, Resulting from 8th Consecutive Record Quarter." In the press release, the Company represented that fourth quarter and year 1999 results set new records for revenues and income.  Defendant J.D. Carreker touted the Company's results, noting that even stronger growth was ahead, stating in relevant part as follows:

> "The strength of our technology solution set comes through clearly in these quarterly results. After our consulting and services compensated for Y2K's impact earlier in the year, demand is resurfacing for our mainstay software, as well as our Web-based, e-commerce-enabling solutions.  The quarter and year-to-date record revenues reflect the fact our clients are recognizing and are willing to pay for the expanded value we continue to deliver in consulting and other services," stated J.D. Carreker, Chairman and CEO of Carreker-Antinori, Inc.
>
> "As for the longer term, banks are conspicuously focusing large budgets and top executives on e-commerce. With our long-time client relationships, our large installed base, and our reputation for quality and leadership, we find ourselves in exactly the right place at the right time. Our e-commerce value proposition is finding

23



strong demand throughout the market, starting with our strategic support all the way through to our technology solutions.

52.     On May 1, 2000, Carreker filed its 1999 annual report with the SEC on Form 10-K, which was signed by defendants J.D. Carreker, James Carreker, Fischer, Lee, Sias, House and Gage.   The Company represented that the financial statements contained therein were prepared in accordance with GAAP. In that regard, the Company included in the Form 10-K a letter from Ernst & Young, its outside auditor, which stated as follows in relevant part:

> REPORT OF ERNST & YOUNG LLP, INDEPENDENT
> AUDITORS
> The Board of Directors and Stockholders
> Carreker-Antinori, Inc.
>
> We have audited the accompanying consolidated balance sheets of Carreker-Antinori, Inc. (the Company), as of January 31, 2000 and 1999, and the related consolidated statements of operations, stockholders, equity, and cash flows for each of the three years in the period ended January 31, 2000. These financial statements are the responsibility of the Company's management.   Our responsibility is to express an opinion on these financial statements based on our audits. ...
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Carreker-Antinori, Inc. at January 31, 2000 and 1999, and the consolidated results of its operations and its cash flows for each of the three years in the period ended January 31, 2000, in conformity with accounting principles generally accepted in the United States.

The Company reported a 37% increase in revenues over the prior year and a 52% increase in net earnings.  Specifically the Company reported the following financial results:

| | YEAR ENDED JANUARY 31, | | |
| --- | --- | --- | --- |
| | 2000 | 1999 | 1998 |
| Revenues: | | | |
| Consulting and management service fees | $49,725 | $26,328 | $21,314 |
| Software license fees | 13,727 | 16,327 | 11,223 |
| Software maintenance | 6,985 | 5,031 | 4,274 |
| Software implementation fees | 5,116 | 6,557 | 4,094 |

24

| | | | |
|---|---|---|---|
| Hardware sales and other fees | 267 | 774 | 1,876 |
| Total revenues | 75,820 | 55,017 | 42,781 |
| Net income | $7,894 | $5,172 | $3,005 |
| Basic earnings per share | $0.43 | $.32 | $.24 |
| Diluted earnings per share | $0.42 | $.30 | $.21 |

53.     On June 14, 2000, Carreker filed its quarterly report for its fiscal quarter ended April 30, 2000 with the SEC on Form 10-Q, which was signed by defendants J.D. Carreker and Gage. In a section of the Form 10-Q titled "Basis of Presentation", the Company represented that the financial statements contained therein fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

### 1. BASIS OF PRESENTATION

> The accompanying unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments (consisting only of normal, recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows of the Company. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to rules and regulations promulgated by the Securities and Exchange Commission. These statements should be read in conjunction with the audited financial statements and notes thereto for the years ended January 31, 2000, 1999, and 1998 included in the Company's Form 10-K for the fiscal year ended January 31, 2000 on file with the Commission. ...

According to the Company's reported financial performance, Carreker's remarkable rate of revenue and income growth continued unabated. Specifically, Carreker reported the following results for the quarter:

| | Three Months Ended April 30, | |
|---|---|---|
| | 2000 | 1999 |
| REVENUES: | | |
| Consulting and management service fees | $13,110 | $8,324 |
| Software license fees | 4,173 | 3,093 |
| Software maintenance fees | 2,282 | 1,502 |
| Software implementation fees | 2,495 | 1,443 |
| Hardware and other fees | ----- | 122 |
| | ------------- | ------------- |

25

| | | |
|---|---|---|
| Total Revenues | 22,060 | 14,484 |
| Net income | $1,477 | $963 |
| Basic earnings per share | $0.08 | $0.03 |
| Diluted earnings per share | $0.08 | $0.05 |

54.     On September 14, 2000, Carreker filed its quarterly report for its fiscal quarter ended July 31, 2000 with the SEC on Form 10-Q, which was signed by defendants J.D. Carreker and Gage.  In a section of the Form 10-Q titled "Basis of Presentation", the Company represented that the financial statements contained therein fairly presented the Company's results of operations and financial condition, stating as follows:

> 2. BASIS OF PRESENTATION
>
> The accompanying unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments (consisting only of normal, recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows of the Company.   Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to rules and regulations promulgated by the Securities and Exchange Commission.  These statements should be read in conjunction with the audited financial statements and notes thereto for the years ended January 31, 2000, 1999, and 1998 included in the Company's Form 10-K for the fiscal year ended January 31, 2000 on file with the Commission. ...

For the quarter, sales reportedly skyrocketed by 52% over the second quarter of 1999, while net income similarly rose by 50%.  Specifically, Carreker reported the following results for the quarter:

| | Three Months Ended July 31, | | Six Months Ended July 31 | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| Revenues: | | | | |
| Consulting and management service fees | $21,766 | $13,039 | $34,876 | $21,363 |
| Software license fees | 1,840 | 2,762 | 6,013 | 5,855 |
| Software maintenance | 2,713 | 1,764 | 4,995 | 3,266 |

26

| | | | | |
|---|---|---|---|---|
| Software implementation fees | 2,311 | 1,232 | 4,806 | 2,675 |
| Hardware sales and other fees | 32 | 75 | 32 | 197 |
| Total revenues | 28,662 | 18,872 | 50,722 | 33,356 |
| Net income | $3,445 | $2,286 | $4,922 | $3,249 |
| Basic earnings per share | $0.19 | $0.12 | $0.27 | $0 18 |
| Diluted earnings per share | $0.18 | $0.12 | $0.25 | $0 17 |

55. On December 13, 2000, Carreker filed its quarterly report for its fiscal quarter ended October 31, 2000 with the SEC on Form 10-Q, which was signed by defendants J.D. Carreker and Gage. In a section of the Form 10-Q titled "Basis of Presentation", the Company represented that the financial statements contained therein fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

### 1. BASIS OF PRESENTATION

The accompanying unaudited condensed consolidated financial statements reflect, in the opinion of management, all adjustments (consisting only of normal, recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows of the Company. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to rules and regulations promulgated by the Securities and Exchange Commission. These statements should be read in conjunction with the audited financial statements and notes thereto for the years ended January 31, 2000, 1999, and 1998 included in the Company's Form 10-K for the fiscal year ended January 31, 2000 on file with the Commission.

The Company again reported record revenues and earnings, as follows:

| | Three Months Ended October 31, | | Nine Months Ended October 31, | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| REVENUES· | | | | |
| Consulting fees | $17,620 | $15,072 | $52,496 | $35,436 |
| Software license fees | 5,712 | 2,692 | 11,725 | 8,546 |
| Software maintenance fees | 2,970 | 1,677 | 7,965 | 4,943 |
| Software implementation fees | 2,455 | 1,391 | 7,262 | 4,066 |

| | | | |
|---|---|---|---|
| Hardware sales and other fees | ------ | 34 | 32 | 230 |

| | | | | |
|---|---|---|---|---|
| | ---------- | ---------- | ---------- | ---------- |
| Total revenues | 28,757 | 20,866 | 79,480 | 54,221 |
| Net income | $2,722 | $2,033 | $8,644 | $5,282 |
| Basic earnings per share | $0 20 | $0.11 | $0.46 | $0.29 |
| Diluted earnings per share | $0.19 | $0.11 | $0.44 | $0.28 |

56.     On March 13, 2001, Carreker issued a press release announcing "Record Quarterly, Fiscal Year Results," for 2000.  Revenues and net income for the fourth quarter of 2000 reportedly increased by 42.6% and 92%, respectively, over the fourth quarter of 1999. According to the press release, this quarter marked the "12th consecutive quarter" of strong growth for the Company.  For the year 2000, revenues and net income jumped 45% and 72%, respectively.   In the press release, defendant J.D. Carreker highlighted the Company's accomplishments for the year and the strong demand for its products, which he represented would continue to grow as banks sought to increase efficiency, stating as follows in relevant part:

> "Revenues, profits and earnings per share for the fourth quarter and fiscal year 2000 were the highest in Carreker's history, and we are pleased to have delivered record financial results to our shareholders.  This performance is a testament to our strategic vision and our value proposition, which can provide earnings improvements of $1 million for every $1 billion in assets.  As a result, major financial institutions continue to benefit from the value our e-finance solutions deliver throughout their enterprise. Since some of our value-based solutions provide high returns on investment and short payback periods, demand is strong, especially during this economic cycle," said J.D. "Denny" Carreker, Chairman and Chief Executive Officer of Carreker Corporation. "We continue to successfully penetrate markets abroad and are pleased that our international customer base now includes over half of the market throughout the U.K., Australia, Canada and Ireland. We also continue to aggressively target complementary sectors such as insurance and brokerage and we are pursuing many opportunities to leverage our reach into these vertical markets.  As we look forward into 2001, business is strong," Carreker said.

28

I:\Carreker\derivative\Complaint.DOC

57.     On April 30, 2001, Carreker filed its annual report for its fiscal year ended
January 31, 2001 with the SEC on Form 10-K, which was signed by defendants J.D. Carreker,
James Carreker, Fischer, Lee, Sias, House and Gage.   The Company represented that the
financial statements contained therein were prepared in accordance with GAAP.  In that regard,
the Company included in the Form 10-K a letter from Ernst & Young, its outside auditor, which
stated as follows in relevant part:

> **REPORT OF ERNST & YOUNG LLP, INDEPENDENT
> AUDITORS**
> The Board of Directors and Stockholders
> Carreker Corporation
>
> We have audited the accompanying consolidated balance sheets of
> Carreker Corporation (the Company), as of January 31, 2001 and
> 2000, and the related consolidated statements of operations,
> stockholders' equity, and cash flows for each of the three years in
> the period ended January 31, 2001.  These financial statements are
> the responsibility of the Company's management.     Our
> responsibility is to express an opinion on these financial statements
> based on our audits.   In our opinion, the financial statements
> referred to above present fairly, in all material respects, the
> consolidated financial position of Carreker Corporation at January
> 31, 2001 and 2000, and the consolidated results of its operations
> and its cash flows for each of the three years in the period ended
> January 31, 2001, in conformity with accounting principles
> generally accepted in the United States.

The Company reported strong results for the year 2000, with double-digit revenue and earnings
growth, as follows:

|  | YEAR ENDED JANUARY 31, | | | | |
|---|---|---|---|---|---|
|  | 2001 | 2000 | 1999 | 1998 | 1997 |
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | |
| STATE OF OPERATIONS DATA: Revenues: |  |  |  |  |  |
| Consulting fees | $71,715 | $49,725 | $26,328 | $21,314 | $14,407 |
| Software license fees | 18,030 | 13,727 | 15,327 | 11,223 | 6,957 |

29

| | | | | |
|---|---|---|---|---|
| Software maintenance fees | 11,223 | 6,985 | 5,031 | 4,274 | 3,185 |
| Software implementation fees | 9,298 | 5,116 | 5,557 | 4,094 | 3,249 |
| Hardware sales and other fees | ---- | 267 | 774 | 1,876 | 2,737 |
| Total revenues | | 110,266 | 75,820 | 55,017 | 42,781 |
| Net income | $13,594 | $7,894 | $5,172 | $3,005 | $1,360 |
| Basic earnings per share | $0.70 | $0.43 | $0.32 | $0.24 | $0.11 |
| Diluted earnings per share | $0.67 | $0.42 | $0.30 | $.021 | $0.10 |

58.    On June 12, 2001, Carreker filed its quarterly report for its fiscal quarter ended April 30, 2001 with the SEC on Form 10-Q, which was signed by J.D. Carreker and Gage.  In a section of the Form 10-Q titled "Basis of Presentation", the Company represented that the financial statements contained therein were presented in accordance with GAAP and SEC rules and fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

2. BASIS OF PRESENTATION

The accompanying condensed consolidated unaudited financial statements and notes thereto have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission for Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim financial reporting. ...

These financial statements should be read in conjunction with the financial statements, accounting policies and financial notes thereto included in the Company's Annual Report on Form 10-K for the fiscal year ended January 31, 2001 filed with the Securities and Exchange Commission.  In the opinion of management, the accompanying condensed consolidated unaudited financial statements reflect all adjustments (consisting only of normal recurring adjustments) which are necessary for a fair representation of financial results for the interim periods presented.

For the first quarter of 2001, the Company reported a 15% increase in revenues and a slight decrease in net income, as follows:

THREE MONTHS ENDED
APRIL 30,

30

I:\Carreker\derivative\Complaint DOC

|  | 2001 | 2000 |
|---|---|---|
| Consulting fees | $14,845 | $13,110 |
| Software license fees | 5,235 | 4,173 |
| Software maintenance fees | 3,197 | 2,282 |
| Software implementation fees | 2,127 | 2,495 |
| Total revenues | 25,404 | 22,060 |
| Net income | $1,312 | $1,477 |
| Basic earnings per share | $0.06 | $0.08 |
| Diluted earnings per share | $0.06 | $0.08 |

59.    On September 14, 2001, Carreker filed its quarterly report for its fiscal quarter ended July 31, 2001 with the SEC, which was signed by defendants J.D. Carreker and Gage.   In a section of the Form 10-Q titled "Basis of Presentation and New Accounting Standards", the Company represented that the financial statements contained therein were presented in accordance with GAAP and SEC rules and fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

> 1.   BASIS OF PRESENTATION AND NEW ACCOUNTING STANDARDS
>
> The accompanying condensed consolidated unaudited financial statements and notes thereto have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission for Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim financial reporting. ...
>
> In the opinion of management, the accompanying condensed consolidated unaudited financial statements reflect all adjustments (consisting only of normal recurring adjustments) which are necessary for a fair representation of financial results for the interim periods presented

Reported revenues for the quarter continued to grow, while the Company reported a loss for the quarter, as follows:

|  | Three Months Ended July 31, | Six Months Ended July 31, |
|---|---|---|

31

I:\Carreker\derivative\Complaint.DOC

|  | 2001 | 2000 | 2001 | 2000 |
|---|---|---|---|---|
| REVENUES: |  |  |  |  |
| Consulting fees | $10,655 | $21,766 | $25,500 | $34,876 |
| Software license fees | 12,057 | 1,872 | 17,292 | 6,045 |
| Software maintenance fees | 6,437 | 2,713 | 9,633 | 4,995 |
| Software implementation fees | 4,703 | 2,311 | 6,831 | 4,806 |
|  | ---------- | ---------- | ---------- | ---------- |
| Total revenues | 33,852 | 28,662 | 59,256 | 50,722 |
| Net income (loss) | $(11,641) | $3,445 | $(10,329) | $4,922 |
| Basic earnings (loss) per share | $(0.53) | $0.19 | $(0.47) | $0.27 |
| Diluted earnings (loss) per share | $(0.53) | $0.18 | $(0.47) | $.025 |

60.    On December 14, 2001, Carreker filed its quarterly report for its fiscal quarter ended October 31, 2001 with the SEC on Form 10-Q which was signed by defendants J.D. Carreker and Gage. In a section of the Form 10-Q titled "Basis of Presentation and New Accounting Standards", the Company represented that the financial statements contained therein were presented in accordance with GAAP and SEC rules and fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

> 1.  BASIS OF PRESENTATION AND NEW ACCOUNTING STANDARDS
>
> The accompanying condensed consolidated unaudited financial statements and notes thereto have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission for Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim financial reporting. ...
>
> In the opinion of management, the accompanying condensed consolidated unaudited financial statements reflect all adjustments (consisting only of normal recurring adjustments) which are necessary for a fair representation of financial results for the interim periods presented.

Reported revenues for the third quarter of 2001 increased over the third quarter of 2000, while the Company reported a loss for the quarter, as follows:

I:\Carreker\derivative\Complaint.DOC



| | Three Months Ended October 31, | | Nine Months Ended October 31, | |
|---|---|---|---|---|
| | 2001 | 2000 | 2001 | 2000 |
| REVENUES: | | | | |
| Consulting fees | $7,066 | $17,620 | $32,567 | $52,496 |
| Software license fees | 7,169 | 5,712 | 24,461 | 11,757 |
| Software maintenance fees | 9,257 | 2,970 | 18,890 | 7,965 |
| Software implementation fees | 6,192 | 2,455 | 13,022 | 7,262 |
| Total revenues | 29,684 | 28,757 | 88,940 | |
| Net income (loss) | $(26,400) | $3,722 | ($36,729) | $8,644 |
| Basic earnings (loss) per share | $(1.21) | 0.20 | (1.68) | $0.46 |
| Diluted earnings (loss) per share | $(1.21) | 0.19 | (1.68) | $0.44 |

61.     On March 12, 2002, Carreker issued a press release announcing its results for the fourth quarter of 2001, and the period ended January 31, 2002. The Company reported that revenues for the quarter increased by 38.8% over the fourth quarter of 2000. While reported income decreased on a year-to-year basis, the Company reportedly earned $1.1 million ($0.05 per share) in the fourth quarter, which was an improvement over the loss reported in the second quarter.

62.     On April 15, 2002, Carreker filed its annual report for its fiscal year 2001 on Form 10-K with the SEC, which was signed by defendants J.D. Carreker, James Carreker, Fischer, Lee, Sias, House and Gage. The Company represented that the financial statements contained therein were prepared in accordance with GAAP. In that regard, the Company included in the Form 10-K a letter from Ernst & Young, its outside auditor, which stated as follows in relevant part:

33

REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

The Board of Directors and Stockholders

Carreker Corporation

We have audited the accompanying consolidated balance sheets of Carreker Corporation (the Company), as of January 31, 2002 and 2001, and the related consolidated statements of operations, stockholders equity, and cash flows for each of the three years in the period ended January 31, 2002. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Carreker Corporation at January 31, 2002 and 2001, and the consolidated results of its operations and its cash flows for each of the three years in the period ended January 31, 2002, in conformity with accounting principles generally accepted in the United States.

The Company's reported revenues for 2001 represented a 19.4% increase over year 2000 reported revenue, while the Company reported a net loss for the year. In relevant part, the Form 10-K reported the Company's financial performance as follows:

YEAR ENDED JANUARY 31,

|  | 2001 | 2000 | 2001 |
|---|---|---|---|
| REVENUES: |  |  |  |
| Consulting fees | $42,842 | $71,715 | $49,725 |
| Software license fees | 40,291 | 18,030 | 13,994 |
| Software maintenance fees | 29,347 | 11,223 | 6,985 |
| Software implementation fees | 19,210 | 9,298 | 5,116 |
| Total revenues | 131,690 | 110,266 | 75,820 |
| Net income (loss) | $(35,605) | $13,594 | $7,894 |
| Basic earnings (loss) per share | $(1.63) | $0.70 | $0.43 |
| Diluted earnings (loss) per share | $(1.63) | $0.67 | $0.42 |

63. On June 13, 2002, Carreker filed its quarterly report for its fiscal quarter ended April 30, 2002 with the SEC on Form 10-Q, which was signed by defendants J.D. Carreker and

34

Gage. In a section of the Form 10-Q titled "Summary of Significant Accounting Procedures, Principles of Consolidation and Presentation", the Company represented that the financial statements contained therein were presented in accordance with GAAP and SEC rules and fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

> Principles of Consolidation and Presentation
>
> The accompanying condensed consolidated unaudited financial statements and notes thereto have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission for Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim financial reporting. The results of operations for the three months ended April 30, 2002 are not necessarily indicative of the results for the full year.
>
> These financial statements should be read in conjunction with the financial statements, accounting policies and financial notes thereto included in the Company's Annual Report on Form 10-K for the fiscal year ended January 31, 2002 filed with the Securities and Exchange Commission. In the opinion of management, the accompanying condensed consolidated unaudited financial statements reflect all adjustments (consisting only of normal recurring adjustments) which are necessary for a fair representation of financial results for the interim periods presented.

According to the Form 10-Q, revenues grew by 33% in the first quarter of 2001 and net income nearly tripled. In relevant part, the Form 10-Q reported the following financial results:

|  | Three Months Ended April 30, | |
|---|---|---|
|  | 2002 | 2001 |
| REVENUES: |  |  |
| Consulting fees | $9,095 | $14,845 |
| Software license fees | 9,339 | 5,235 |
| Software maintenance fees | 10,034 | 3,197 |
| Software implementation fees | 5,746 | 2,127 |
| Out-of-pocket expense reimbursements | 2,668 | 3,061 |
| Total revenues | 37,882 | 28,465 |

35

| | | |
|---|---|---|
| Net income | $3,687 | $1,312 |
| Basic earnings per share | $0.17 | $0.06 |
| Diluted earnings per share | $0.16 | $0.06 |

64. On September 4, 2002, Carreker issued a press release announcing the formation of a "Corporate Governance Committee," which would "advise and assist the Board of Directors in maintaining appropriate corporate governance practices." The Committee was formed, and its creation was publicized, in order to distance headline-grabbing corporate scandals involving other companies that had dominated the media and left the market deeply shaken. The Company stated as follows in this regard:

> Revealing the company's proactive nature, the Board approved the Governance Committee Charter at its June meeting, prior to any regulations imposed by the SEC or NASDAQ. In addition, the Company announced that Chairman and Chief Executive Officer, J. D. (Denny) Carreker and Chief Financial officer, Terry Gage will certify the completeness and accuracy of materials made available by Carreker for investors, including the Company's financial statements. These actions further demonstrate the Company's commitment to its shareholders and its dedication to transparent reporting practices.

> The Committee formally addresses some key concerns to investors today including Board independence from management; the role of independent Directors in compensation and nomination decisions; and the financial acumen of Directors who serve on audit committees

Defendant J.D. Carreker similarly represented that the formation of the Committee merely formalized the Company's already existing corporate governance procedures, which further demonstrated the "quality and integrity of our accounting and corporate governance practices," stating, in relevant part:

> "While many of these initiatives were already in place at Carreker, we formalized them by establishing the Governance Committee. We believe this demonstrates to the investment community that the quality and integrity of our accounting and corporate governance

36

practices is, and always has been, among the best in corporate America."

65.    On September 13, Carreker filed its quarterly report for its fiscal quarter ended July 31, 2002 with the SEC on Form 10-Q, which was signed by defendants J.D. Carreker and Gage. In a section of the Form 10-Q titled "Summary of Significant Accounting Procedures, Principles of Consolidation and Presentation", the Company represented that the financial statements contained therein were presented in accordance with GAAP and SEC rules and fairly presented the Company's results of operations and financial condition, stating as follows in relevant part:

> Principles of Consolidation and Presentation
>
> The accompanying condensed consolidated unaudited financial statements and notes have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission for Form 10-Q and include all of the information and disclosures required by generally accepted accounting principles for interim financial reporting. The results of operations, for the three and six months ended July 31, 2002, are not necessarily indicative of full-year results.
>
> These financial statements should be read in conjunction with the financial statements, accounting policies and financial notes included in the Company's Annual Report on Form 10-K for the fiscal year ended January 31, 2002, filed with the Securities and Exchange Commission. In the opinion of management, the accompanying condensed consolidated unaudited financial statements reflect all adjustments (consisting only of normal recurring adjustments) that are necessary for a fair representation of financial results for the interim periods presented.

Revenues for the quarter reportedly increased on a year-to-year basis, while net income of $4.024 million for the quarter was reportedly well above the $11.6 million loss reported in the second quarter of 2001.

66.    The statements referenced above in ¶¶44-66, were materially false and misleading when made because they failed to disclose the following facts, among others:

(a)    that the Company was improperly recognizing revenues thereby artificially inflating its revenues and income;

(b)    that the Company's reported results were not prepared in accordance with GAAP and did not fairly present the financial condition of the Company;

(c)    that the Company was not dedicated to "transparent reporting practices" and that, instead, it materially misled the market for years by artificially and materially inflating its revenues and earnings.  For the same reasons, its expressed commitment to "the quality and integrity of [the Company's] accounting" and that Defendant J. D. Carreker would certify the accuracy and completeness of the Company's financials was materially false and misleading because it gave false comfort in that regard.

**The Truth Begins To Emerge**

67.    On December 10, 2002, Carreker shocked the market by revealing that it had convened a Special Committee of supposedly independent board members to investigate whether the Company had improperly booked revenues in the wrong quarter(s).  In a press release, the Company cautioned that a restatement of previously filed financial reports was possible and that "its historical financial statements for prior periods should not be relied upon."  It appears from the press release that Carreker recognized revenue in a particular quarter that should properly have been recognized over a number of quarters.  In this regard, defendant J.D. Carreker stated, in pertinent part, as follows:

> "In light of the seriousness with which we view corporate disclosure matters, we are moving aggressively to review and, if necessary, correct our financial statements," said Carreker's Chairman and Chief Executive Officer, John D. (Denny) Carreker. "We believe that many of the timing issues and related problems stem from a Company revenue guideline, which allows for contracts signed and dated by the end of a quarter to be physically received in Carreker's legal department as late as noon on the next business day following the end of the quarter.  We set the contract

> receipt deadline to accommodate the mechanics of delivery from
> our global operations. We are working closely with the Special
> Committee and our independent auditors to address these issues as
> quickly as possible, and are taking steps to insure these problems
> do not recur in the future."

The Company did not file its financial report for the third quarter of 2002, pending the outcome of the review, stating that it would hold a conference call to discuss its third quarter results on December 23, 2002.

68.    Coming only three months after the Company's assurances of its "dedication to transparent reporting practices" and its attestation to the "quality and integrity of our accounting," the Company's belated disclosure that it had been improperly recognizing revenues severely and negatively impacted its stock price, causing it to fall by 22.6% in one day on extremely heavy trading volume, from a December 9 close of $5.08 per share to close at $3.93 per share on December 10.

69.    On December 17, 2002, Carreker filed a "Current Report" with the SEC, disclosing that the SEC had initiated an informal inquiry into Carreker's accounting practices, stating, in pertinent part, as follows:

> Carreker Corporation has received notice that the Securities and
> Exchange Commission has commenced an informal inquiry into
> matters under review by Carreker's Special Committee. As
> previously disclosed, in conjunction with the work of its Special
> Committee, Carreker is reviewing its financial statements,
> principally focusing on the timing of its recognition of revenues
> during prior periods. Carreker intends to cooperate fully with the
> Commission with respect to this inquiry.

70.    In a December 19, 2002 press release, the Company announced the review was not yet completed and that the Company would continue to postpone the release of its third quarter 2002 results. Then, on December 24, 2002, the Company announced that NASDAQ had



notified the Company that its stock might be delisted because it had failed to file its financial

report for the third quarter of 2002.

71.     On January 28, 2003, the Company issued a press release announcing that the

Special Committee had completed its investigation and that the Company would be restating its

financial results beginning with the 1998 fiscal year.  According to the press release, the

investigators concluded that Carreker had improperly booked revenues by, among other things,

recognizing at once revenues which should have been recognized over a period of time, stating in

relevant part as follows:

> Carreker Corporation [NASDAQ: CANIE] announced today that
> its Special Committee has completed its investigation and
> presented its findings to the Company's Board of Directors.
>
> The Committee investigated a number of matters relating to the
> Company's financial statements and disclosures, particularly in the
> area of the Company's revenue recognition policies.  In this regard,
> while none of the affected contracts were fond to be invalid, the
> Committee identified contract dating issues involving the
> Company's practices relating to when contracts became effective
> and the corresponding recognition of revenue from those contracts.

**Undisclosed Adverse Information**

72.     The market for Carreker's securities was open, well-developed and efficient at all

relevant times.  As a result of these materially false and misleading statements and failures to

disclose, Carreker's common stock traded at artificially inflated prices during the Relevant

Period.    The artificial inflation continued until December 10, 2002, when Carreker

acknowledged that it would be restating the Company's financial results, filed with the SEC

during the Relevant Period.  Investors purchased or otherwise acquired Carreker securities

relying upon the integrity of the market price of Carreker's securities and market information

relating to Carreker, and have been damaged thereby.

I:\Carreker\derivative\Complaint.DOC

73. During the Relevant Period, defendants materially misled the investing public, thereby inflating the price of Carreker's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including, among other things:

(a) that the Company's financial statements were not prepared in accordance with GAAP and/or in accordance with the federal securities laws and SEC regulations concerning fair reporting;

(b) that the Company had violated GAAP and its own accounting policies by improperly recognizing revenues, income and earnings;

(c) that the Company's seeming growth was, in material part, the result of improper accounting entries; and

(d) that the Company's estimates, projections and opinions as to its expected revenues, earnings, income and value of its stock were lacking in reasonable basis at all relevant times.

74. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by investors during the Relevant Period. As described herein, during the Relevant Period, Defendants made or caused to be made a series of materially false or misleading statements about Carreker's business prospects, operations and financial performance. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Carreker and its business prospects, operations and

41

financial performance, thus causing the Company's securities to be overhauled and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Relevant Period resulted in investors purchasing the Company's securities at artificially inflated prices, which further resulted in numerous securities class action lawsuits being filed against Carreker and certain of its officers and directors to the detriment of the Company when the truth was revealed.

**False Financial Statements**
**Issued During the Relevant Period**

75.    Defendants represented that Carreker's Relevant Period financial statements were prepared in accordance with GAAP. As set forth herein, these representations were materially false and misleading because Defendants caused Carreker to issue false and misleading financial statements that misrepresented and/or artificially and improperly inflated the Company's operating results during the Relevant Period.

76.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1 ¶42 states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about

future enterprise performance, those expectations are commonly
based at least partly on evaluations of past enterprise performance.

77. As described above, Carreker, in violation of GAAP, issued financial statements
that included improperly recognized revenue, leading the Company to announce a restatement of
its previously filed financial statements. As a result of these manipulations, Carreker issued
financial statements during the Relevant Period that were materially false and misleading and
that violated GAAP, as the Defendants knew, or recklessly disregarded. In these ways,
unsuspecting investors were deceived about Carreker's true operating results during the Relevant
Period. This of course led to class action lawsuits being filed against the Company to its
detriment.

**Additional Allegations of Wrongdoing by the**
**Defendants and/or Defendants' Knowledge of Same**

78. Defendants James Carreker, House, Fischer, Lee and Sias were members of
Carreker's Board of Directors' Audit Committee during the relevant period.

79. As described in the Company's 2002 proxy:

The Audit Committee is responsible for (i) recommending to the board for
selection of outside auditors, (ii) reviewing the audit scope and risk assessment
process, (iii) reviewing the relationships that may affect the independence of the
outside auditors, (iv) reviewing any major internal control accounting issues of
the company, and (v) reviewing and discussing with management and the outside
auditors the annual audited financial statements included in the company's 10-K
as well as the interim financial statements.

80. In order to meet the standard of care in discharging their duties, in light of the
audit standard from proxy information which the Director Defendants knew, Defendants James
Carreker, House, Fischer, Lee and Sias were obligated to:

a. Consider and order changes regarding appropriate auditing and accounting
principles and practices to be used in the preparation of the Company's financial statements;

43

      b.     Review the adequacy of the Company's internal accounting controls and put new controls in place to eliminate the misreporting of revenue;

      c.     Factually correct the Company's annual financial statements, and any certification, report, opinion, or review rendered by the external auditor in connection with those financial statements;

      d.     Question and ascertain why management and the auditor did not prepare the financial statements properly and eliminate the false and fraudulent revenues;

      e.     Oversee the results of each external audit of the corporation, the report of the audit, any related management letter, and management's responses to recommendations made by the external audit in connection with the audit;

      f.     Initiate and oversee the reports of the internal auditing function that are material to the Company as a whole and management's responses to those reports;

      g.     Refuse to accept the assurances of management that the auditing was proper and require the Board to reverse the false revenues; and

      h.     Withdraw and correct false statements made in press releases disseminated to the public, the SEC, and the market analysts.

81.     Despite the exacting duties imposed upon them, the members of the Audit Committee, including James Carreker, House, Fischer, Lee and Sias completely failed to meet their Audit Committee duties in violation of their fiduciary duties to the Company and its shareholders.

82.     On September 17, 2002 a group of current and/or former Carreker employees identifying themselves as the "Committee of Concerned Carreker Employees" wrote a letter to Carreker's then members of the Audit Committee, Fischer, House, Lee and Steinhart. As stated

in the September 17th letter "[t]he purpose of this letter is to maintain a record of Carreker's mismanagement, failure to comply with SEC disclosure requirements, illegal and fraudulent conduct of its CEO and other officers of the Company, and the Board of Directors knowledge and complicity with these actions."

83.    The letter noted that "[o]ver the past several years, these matters have been brought to the attention of several individual board members (both past and presently serving on the board) and collectively to the board as a whole."

84.    The September 7th letter proceeded to detail "but a sample of those illegal acts through failure to disclose or fraudulent conduct and abuse of power carried out by [J. D.] Denny Carreker:"

- <u>Misappropriation of funds</u> – (a) weekly, [J. D.] Denny Carreker receives thousands of Company dollars and cash from Roxanne a corporate accounting bookkeeper for the Company and personal secretary to [J. D.] Denny Carreker. These payments of cash represent compensation to Mr. Carreker and he has never disclosed it to regulators as salary or other compensation even though required to do so.

        …

    Further, the Company has repeatedly paid thousands of dollars for [J. D.] Denny Carreker's furniture, interior decorator consulting fees and craft-worker's fees performing reconstruction work at his home in Highland Park at the demand and direction of his wife, Connie.

        …

- <u>Fraudulent Recognition of Revenues</u> – Mr. Carreker and his CFO, [Defendant] Terry Gage, have fraudulently recognized revenue from company business and contracts which they know violates GAAP rules and improperly inflates corporate profits and corporate stock values with intent to mislead investors. This has been conducted in many forms - back dating contract[s]; claiming revenue from contracts not yet signed by the client in the reporting period claimed and the premature announcement of signed business when no such contract has been signed by the client through premature press releases; intentionally overestimating the percent of completion/installation of software contracts in order to recognize revenue; overstating consulting fees when the client disputes the value of consulting services received or the completion of those

45

services. Some of the contracts include First Star, Chase Bank, First Virginia (revenue enhancement), Key Bank (software installation), First Boston (risk management) and Mellon Bank (software). Through Bob Olson (EVP for Marketing) and [J. D.] Denny Carreker, employees have been encourage[d]or intimidated (through loss of employment) to lie or misrepresent to auditors the true status of these contracts as they relate to GAAP interpretation and application. Many employees have informed the Company's audit committee of these illegal acts apparently resulting in no action or investigation because of the lack of independence maintained there.

...

•    <u>Insider trading</u> – Mr. Carreker's son Brent has openly bragged to Company employees of his profits from his insider trading of Carreker stock. Also, Connie Carreker, the CEO's wife frequently shares and uses (herself) insider information with friends and her investment club involving Carreker stock. Again, she has openly bragged to employees of her gains. In fact the impetus for George Matus (SVP-Investor Relations) to violate insider trading laws was the apparent ease and unaccountability with which Mr. Carreker's family violates securities law. [2] Finally, John Carreker has established off-shore bank accounts in the Grand Cayman Islands to evade detection from the SEC of utilizing insider information of the Company to illegally trade Carreker stock.

85.    The September 17th letter further related that:

Nepotism is actively invoked [at Carreker] by the CEO [J. D. Carreker] through the appointment of his sons (John Carreker, EVP. International; and Brent Carreker, Managing Principal) to key management positions and the employment of relatives in part time positions. Several of these relatives to the CEO collect paychecks bi-monthly from the company while failing to keep any office hours of attendance or otherwise perform work for the company as required by all other employees.

86.    The September 17th letter was also copied to the Securities and Exchange Commission.

---

[2] On June 24, 2002 the United States District Court for the Eastern District of Texas entered a final judgment against George Matus and his brother Peter Matus enjoining each from future violations of federal securities laws and barring George Matus from serving as an officer or director of a public company and imposing the maximum single penalties available under the Insider Trading Sanctions Act. The suit had been instituted against the two brothers on December 4, 2001 by the SEC.

46

I:\Carreker\derivative\Complaint.DOC

87.     Additionally, Plaintiff's counsel has been informed by a person who is apparently a current or former Carreker employee that members of the Audit Committee of Carreker's Board of Directors were well aware of the Company's wrongdoing during the Relevant Period. According to the informant these members included Audit Committee members Lee, House, Sias and Fischer.

88.     In connection with Carreker's fraudulent recognition of revenues, the informant has additionally advised Plaintiff's counsel that typically in the last two (2) months of each quarter the Company would be concerned about meeting expectations for the quarter's revenues and earnings. Accordingly, often times the Company would issue a vague press release announcing the signing of a contract with a large bank. The Company would then recognize the revenues from the transaction although the contract had not actually been signed nor completed in violation of GAAP principles. Although the contract would usually be completed in the following quarters, it would typically be at a substantial discount of the revenue recognized by the Company in connection with the transaction.

## ADDITIONAL DEMAND FUTILITY ALLEGATIONS

89.     Plaintiff has not made a demand on the Carreker Board of Directors to prosecute the claims alleged herein. Such demand is futile, and thus excused, for the following reasons:

a.      The Defendants constitute a controlling group of Carreker's Board of Directors and represent the top executive officers of Carreker. There is a substantial likelihood that the Defendants are personally liable to Carreker for the damages it has sustained and will sustain in the future as a result of the wrongs described above;

b.      As a consequence, each Defendant has an irreconcilable conflict of interest regarding the prosecution of this action and has a personal pecuniary interest that would be



adversely affected if the claims herein were pursued. Accordingly, the Defendants cannot exercise the requisite independence and disinterestedness necessary to consider a pre-suit demand impartially and in good faith;

      c.      A majority of the directors of Carreker, as detailed herein, participated in, approved and permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Carreker stockholders and investors and are, therefore, not disinterested and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

      d.      A majority of the directors had a responsibility and obligation to assure that all press releases and filings of SEC reports were accurate and that all financial controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint;

      e.      In order to bring this suit, a majority of the directors of Carreker would be forced to sue themselves and/or persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

      f.      As also detailed above, the directors cannot be relied upon to reach a truly independent decision to commence the action against themselves or other directors and officers responsible for the misconduct alleged herein, in that, *inter alia*, the Board of Directors is totally dominated by Defendant J. D. Carreker who has a reason not to pursue the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede;

g.   Any suit by the directors of Carreker to remedy these wrongs would likely expose the Director Defendants to further violations of securities laws which would result in additional civil actions being filed against one or more of the Director Defendants (J. D. Carreker is already a named defendant in the class action lawsuits and other directors may be named); thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves;

h.   Carreker has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct which caused the filing of securities class actions against Carreker, nor have they attempted to recover from the Defendants any part of the damages Carreker suffered and will suffer thereby;

i.   If the Defendant Directors were to bring this derivative action against themselves, they would thereby expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities law.  Such admissions would greatly increase the probability of their personal liability in the Class Actions, in an amount likely to be in excess of any insurance coverage available to the Director Defendants;

j.   The Director Defendants are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any, if the Director Defendants initiated an action against any of the other Director Defendants named herein.  Therefore, Carreker's Board, or any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the Defendants because to do so would result in the loss of their insurance coverage.

49

90.     Plaintiff has not made any demand on the shareholders of Carreker to institute this action since such demand would be a futile and useless act for the following reasons:

      a.      Carreker is a publicly traded company with thousands of shareholders;

      b.      Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or telephone numbers of shareholders; and

      c.      Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could even be individually identified.

91.     Plaintiff has no adequate remedy at law.  This action is not a collusive one to confer jurisdiction on the Court that it would not otherwise have.

## FIRST CAUSE OF ACTION

### Derivative Claim for Intentional Breach of Fiduciary Duty

92.     Plaintiff repeats and realleges each and every allegation above as though set forth fully herein.  This cause of action is asserted against all Defendants.

93.     Each Defendant engaged in and/or aided and abetted the aforesaid conduct in intentional breach and/or reckless disregard of the fiduciary duties which he owed to the Company and its shareholders as described herein.

94.     By reason of the foregoing, Defendants have damaged Carreker by, among other things, exposing the Company to millions of dollars in potential liability for violations of federal securities laws.

95.     Plaintiff, as shareholder and representative of Carreker, seeks damages and other relief for Carreker as hereinafter set forth.

I \Carreker\derivative\Complaint DOC

## SECOND CAUSE OF ACTION

### Derivative Claim for Negligent Breach of Fiduciary Duty

96.     Plaintiff repeats and realleges every allegation above as though fully set forth herein. This cause of action is asserted against all Defendants.

97.     Each Defendant engaged in and/or aided and abetted the aforesaid conduct without exercising the reasonable and ordinary care which he, as a fiduciary, owed to Carreker and its shareholders and has thereby negligently breached and/or aided and abetted breaches of fiduciary duties to Carreker and its shareholders.

98.     By reason of the foregoing, Defendants have damaged Carreker.

99.     Plaintiff, as shareholder and representative of Carreker, seeks damages and other relief for the Company as hereinafter set forth.

## THIRD CAUSE OF ACTION

### Derivative Claim for Waste of Usurpation and Corporate Assets

100.    Plaintiff repeats and realleges each and every allegation above as though set forth fully herein. This cause of action is asserted against all Defendants.

101.    As a result of the tortious conduct described above, Defendants have wasted and/or usurped millions of dollars in corporate assets or knowingly and recklessly permitted same.

102.    Plaintiff, as shareholder and representative of Carreker, seeks damages and other relief for the Company as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### Derivative Claim for Gross Mismanagement

51

I:\Carreker\derivative\Complaint DOC

103. Plaintiff repeats and realleges each and every allegation above as though set forth fully herein. This cause of action is asserted against all Defendants.

104. As detailed more fully herein, Defendants each possess a duty to Carreker and its shareholders to prudently supervise, manage and control Carreker's operations.

105. Defendants by their actions, either directly or through aiding and abetting, abandoned and abdicated their duties and responsibilities with regard to prudently managing Carreker as set forth herein.

106. By reason of the foregoing, Defendants have damaged Carreker.

107. Plaintiff, as shareholder and representative of Carreker, seeks damages and other relief for the Company as hereinafter set forth.

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Directing Defendants to account to and repay to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B. Requiring Defendants to return to Carreker all salaries, payments and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Carreker, or aided and abetted same.

C. Directing the Individual Defendants to establish and maintain effective compliance programs to ensure that Carreker's affiliates and employees do not engage in wrongful and illegal practices;

D. Directing all Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of Defendants' culpable conduct;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

F.      Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May _28_, 2003

William B. Federman, Esq., TBN 00794935
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/Fax (405) 239-2112
-and-
2926 Maple Avenue, Suite 200
Dallas, TX 75201


**ATTORNEYS FOR PLAINTIFF**

I \Carreker\derivative\Complaint.DOC

## VERIFICATION

I, Barbara I. Smith declare that I have reviewed the Shareholder Derivative Complaint prepared on behalf of Carreker Corporation, and I authorize its filing. I further declare that I am a current holder, and have been a holder, of Carreker Corporation common stock during the time in which the wrongful conduct alleged and complained of in the Complaint was occurring.

*Barbara I. Smith*

Barbara I. Smith